UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

ALLIANCE FOR OPEN SOCIETY
INTERNATIONAL, INC. et al.,

               Plaintiffs,

   - against -

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT et al.,

               Defendants.

------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:** _____
**DATE FILED:** 1/30/15

05 Civ. 8209

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

## I. INTRODUCTION

Plaintiffs Alliance for Open Society International ("AOSI"), Open Society Institute ("OSI"), Pathfinder International ("Pathfinder"), and Global Health Council ("GHC") (collectively "Plaintiffs") brought action against defendants, the United States Agency for International Development ("USAID"), the United States Department of Health and Human Services ("HHS"), and the United States Centers for Disease Control and Prevention ("CDC") (collectively "Defendants," or the "Agencies," or the "Government"). Plaintiffs sought a preliminary injunction barring the Government from applying 22 U.S.C. Section 7631(f), which requires an organization to have a "policy explicitly opposing prostitution and sex trafficking" (the "Policy Requirement") to be eligible for Government grants

under the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003 (the "Leadership Act"). This Court granted a preliminary injunction barring the Government from enforcing the Policy Requirement against the Plaintiffs because enforcement would cause Plaintiffs irreparable harm and likely amount to coerced speech endorsing the Government's message, thereby violating their First Amendment right to free speech. (Dkt. Nos. 49, 53, 83.) This Court's decision was subsequently affirmed by the Second Circuit and then by the United States Supreme Court. Alliance for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev., 651 F.3d 218, 224 (2d Cir. 2011), aff'd, 133 S. Ct. 2321 (2013). The Court will assume familiarity with the legal and factual background through the Supreme Court's June 20, 2013 decision affirming the preliminary injunction.

By letter dated September 23, 2014, Plaintiffs sought a pre-motion conference to request the Court convert the preliminary injunction to a permanent injunction, also claiming that the Government failed and continues to fail to comply with the Supreme Court's ruling in this case. (Dkt. No. 106.) The Government responded by letter dated October 3, 2014 (Dkt. No. 107), and the Plaintiffs replied by letter dated October 9, 2014. (Dkt. No. 108.) A pre-motion conference was held on

-2-

October 16, 2014, at which the Court directed both parties to submit documentation supporting their arguments. Both parties submitted supporting materials. (Dkt. Nos. 112-17.)

Based on the submissions of the parties and the October 16, 2014 hearing, there are six issues to be decided: first, whether the Government has, in accordance with the preliminary injunction issued by this Court, properly exempted Plaintiffs from meeting the Policy Requirement; second, whether the language exempting Plaintiffs from the Policy Requirement in the USAID requests for proposals ("RFPs") and requests for applications ("RFAs") is so confusing that it chills free speech; third, whether the Supreme Court's decision that Plaintiffs' "affiliates" fall within the scope of the injunction was limited to domestic affiliates, or alternatively, also applies to foreign affiliates; fourth, whether the preliminary injunction in place requires the Government to include language exempting Plaintiffs from the Policy Requirement in its other official communications, including solicitations ("Other Communications"), in addition to in its RFPs and RFAs; fifth, whether the Supreme Court's Opinion found 22 U.S.C. Section 7631(f) to be unconstitutional on its face such that the Government should be precluded from enforcing it against all domestic non-government organizations ("NGOs"), or instead

whether the Supreme Court found the Policy Requirement unconstitutional as applied, meaning that the Government should be precluded from enforcing it only against the Plaintiffs in this action; and sixth, whether the Plaintiffs have met their burden in seeking a permanent injunction.

## II. DISCUSSION

### A. THE GOVERNMENT'S COMPLIANCE WITH THE COURT'S PRELIMINARY INJUNCTION

At the October 16, 2014 conference, there was significant argument over how long the Government has taken to comply with each successive court ruling and how successful the Government has been with its compliance. The Agencies claim they have complied with the Court's preliminary injunction by not enforcing the Policy Requirement against the Plaintiffs and by adding language to their grant contracts explicitly exempting Plaintiffs from fulfilling the Policy Requirement as a prerequisite to obtaining grant money through the Leadership Act.

All parties agree that the Government has not actually enforced the Policy Requirement against the Plaintiffs. All parties also agree that RFPs and RFAs referencing the Policy Requirement should make clear that the Plaintiffs are exempt from it. (See Dkt. Nos. 116, 117.) There is some disagreement,

-4-

however, regarding whether all RFPs and RFAs <u>actually</u> contain the required exemption and, if so, whether they have been updated in a timely fashion. (<u>See</u> Dkt. Nos. 116, 117.) Plaintiffs offer numerous examples of RFPs and RFAs that the Agencies created and issued after the Supreme Court's decision affirming this Court's preliminary injunction and that do not contain any exemption. (<u>See</u> Dkt. No. 112, Ex. D.) Again, there is no dispute as to whether RFAs and RFPs <u>should</u> contain an exemption for Plaintiffs. Therefore, the Government is directed to ensure that in fact all RFPs and RFAs referencing the Policy Requirement include an exemption for the Plaintiffs.

B. <u>WHETHER USAID STATES PLAINTIFFS' EXEMPTION IN AN UNCONSTITUTIONALLY CONFUSING MANNER</u>

Each Agency chose different language to express Plaintiffs' exemption from the Policy Requirement. The Plaintiffs argue that the language USAID uses is too confusing, such that it unconstitutionally deters Plaintiffs' affiliates from applying for Leadership Act grants by creating an expectation that they will inevitably be rejected for failing to meet the Policy Requirement. (<u>See</u> Dkt. No. 110, at 22.) USAID argues that the language is clear and it would not deter potential applicants from applying and therefore does not chill speech. (<u>See</u> <u>id.</u> 24.) The USAID language is as follows:

III.  PROHIBITION ON THE PROMOTION OR ADVOCACY OF THE
LEGALIZATION OR PRACTICE OF PROSTITUTION OR SEX TRAFFICKING
(ASSISTANCE)(SEPTEMBER 2014)

(a) The U.S. Government is opposed to prostitution and
related activities, which are inherently harmful and
dehumanizing, and contribute to the phenomenon of
trafficking in persons. None of the funds made available
under this agreement may be used to promote or advocate the
legalization or practice of prostitution or sex
trafficking. Nothing in the preceding sentence shall be
construed to preclude the provision to individuals of
palliative care, treatment, or post-exposure pharmaceutical
prophylaxis, and necessary pharmaceuticals and commodities,
including test kits, condoms, and, when proven effective,
microbicides.

(b)(1) Except as provided in (b)(2), by accepting this
award or any subaward, a non-governmental organization or
public international organization awardee/subawardee agrees
that it is opposed to the practices of prostitution and sex
trafficking.
(b)(2) The following organizations are exempt from (b)(1):

    (I) the Global Fund to Fight AIDS, Tuberculosis and
    Malaria; the World Health Organization; the
    International AIDS Vaccine Initiative; and any United
    Nations agency.

    (ii)    U.S.    non-governmental    organization
    r e c i p i e n t s / s u b r e c i p i e n t s    a n d
    contractors/subcontractors.

    (iii) Non-U.S. contractors and subcontractors if the
    contract or subcontract is for commercial items and
    services as defined in FAR 2.101, such as
    pharmaceuticals, medical supplies, logistics support,
    data management, and freight forwarding.

(Dkt. No. 112, Ex. E, at 60-61.)

    Plaintiffs point to the language HHS uses to exempt them

from the Policy Requirement as a sufficiently clear statement of

the exemption. HHS's language is as follows:

> A standard term and condition of award will be included in the final notice of award; all applicants will be subject to a term and condition that none of the funds made available under this award may be used to promote or advocate the legalization or practice of prostitution or sex trafficking. In addition, non-U.S. nongovernmental organizations will also be subject to an additional term and condition requiring the organization's opposition to the practices of prostitution and sex trafficking.

(Dkt. No. 112, Ex. F, at 30.)

The Court is not persuaded that the USAID language is so unclear that it could cause confusion amongst applicants such that they would think the Policy Requirement applies to them, and subsequently not apply for a grant under the Leadership Act. Though not a model of statutory clarity, the language and format used by USAID is relatively common in documents drafted by attorneys. The Court agrees with the Plaintiffs that the HHS language is clearer, but that is not to say that USAID's choice of different, even if less clear, language and drafting structure in its contracts rises to the level of a First Amendment violation. The Constitution does not command linguistic uniformity or perfect clarity in government contracts. The Court thus concludes that the USAID's wording of its exemption from the Policy Requirement is not so confusing as

-7-

to chill free speech and therefore violate the Constitution.[1]

## C. WHETHER FOREIGN AFFILIATES ARE WITHIN THE SCOPE OF THE SUPREME COURT'S RULING REGARDING "AFFILIATES"

Plaintiffs argue that the Supreme Court found explicitly that a domestic NGO cannot be compelled to voice a policy view different from that of its affiliates because that circumstance would require it to face "the price of evident hypocrisy," and that this determination applies both to Plaintiffs' foreign and domestic affiliates. Alliance, 133 S. Ct. at 2331. The Government argues that the Supreme Court's discussion of affiliates relates to the Government's argument that a domestic NGO could "cabin" the effects of the Policy Requirement by creating a domestic affiliate to adopt the Policy Requirement while the domestic NGO does not, and thus the Supreme Court's discussion of affiliates applies only to domestic affiliates. The Supreme Court's characterization of the Government's position and what it held on the topic of affiliates is stated as follows:

> The Government suggests the guidelines alleviate any unconstitutional burden on the respondents' First Amendment rights by allowing them to either: (1) accept Leadership Act funding and comply with Policy Requirement, but establish affiliates to communicate contrary views on

---

[1]Given that the two agencies chose different ways to frame the Policy Requirement exclusion, one simpler and clearer than the other -- as read by organizations directly interested in and affected by the matter -- USAID would be well-advised to consider adopting the HHS provision and thereby avoid further potential confusion and needless controversy.

-8-

prostitution; or (2) decline funding themselves (thus remaining free to express their own views or remain neutral), while creating affiliates whose sole purpose is to receive and administer Leadership Act funds, thereby "cabin[ing] the effects" of the Policy Requirement within the scope of the federal program. Brief for Petitioners 38-39, 44-49.

Neither approach is sufficient. When we have noted the importance of affiliates in this context, it has been because they allow an organization bound by a funding condition to exercise its First Amendment rights outside the scope of the federal program. See Rust, supra, at 197-98, 111 S.Ct. 1759. Affiliates cannot serve that purpose when the condition is that a funding recipient espouse a specific belief as its own. If the affiliate is distinct from the recipient, the arrangement does not afford a means for the recipient to express its beliefs. If the affiliate is more clearly identified with the recipient, the recipient can express those beliefs only at the price of evident hypocrisy. The guidelines themselves make that clear. See 45 CFR 89.3 (allowing funding recipients to work with affiliates whose conduct is "inconsistent with the recipient's opposition to the practices of prostitution and sex trafficking").

Alliance, 133 S. Ct. at 2331 (emphasis in original).

As the Supreme Court found, a recipient domestic NGO's right to free speech is violated when it must either comply with the Policy Requirement -- an example of forced speech -- or face "the price of evident hypocrisy" by taking a stance differing from that of its affiliate. Cast in this light, it is clear that whether the affiliate is foreign or domestic has no bearing on whether the recipient domestic NGO's rights would be violated by expressing contrary positions on the same matter through its different organizational components. The nature of the affiliate

-9-

is not relevant because it is not any right held by the
affiliate that the Supreme Court's decision protects. Rather, it
is the <u>domestic</u> <u>NGO's</u> constitutional right that the Court found
is violated when the Government forces it to choose between
forced speech and paying "the price of evident hypocrisy." <u>Id.</u>
That constitutional violation is the same regardless of the
nature of the affiliate.

     Accordingly, the Court is persuaded that the Supreme
Court's ruling bars the Defendants from requiring the Plaintiffs
or any of their affiliates -- foreign or domestic -- to comply
with the Policy Requirement.

D. <u>WHETHER OTHER COMMUNICATIONS MUST ALSO INCLUDE AN EXEMPTION</u>

     This Court's preliminary injunction in 2006 ordered that
"[d]efendants are enjoined from terminating, suspending,
denying, refusing to enter into, or denying funding under, any
cooperative agreement, grant, or contract [with Plaintiffs] as
a means of enforcing the [Policy Requirement]." (Dkt. No. 53.)
Further, the Government is enjoined from "inserting the Policy
Requirement in [Plaintiff's] cooperative agreements, grants and
contracts for funding under the Act, unless any such cooperative
agreement, grant, or contract also states that any attempted
enforcement of the Policy Requirement during the Preliminary
Injunction Period will be subject to this Order." (<u>Id.</u>) These

-10-

prohibitions were reiterated in this Court's 2008 preliminary injunction. (See Dkt. No. 83.) All parties agree that the injunction requires that the exemption be included in RFPs and RFAs, but disagree on whether Other Communications must also include an exemption for Plaintiffs.

Plaintiffs argue that the injunction already requires an exemption in Other Communications, or in the alternative, that it should, because the same reasons for an exemption in RFPs and RFAs apply to Other Communications. The Government disagrees, arguing that the injunction does not reference Other Communications nor does it say or suggest anything that would imply the injunction was meant to include them. The injunction bars the Government from denying grants based on Plaintiffs' failure to meet the Policy Requirement, and since the Other Communications are not the instruments through which funding is granted or denied, the Government claims, including the Policy Requirement without an exemption does not violate the Court's preliminary injunction. (See Dkt. No. 117, at 1.) Other Communications are not "legally binding award documents," the Government argues, and since a party can respond to them without yet meeting the Policy Requirement, they cannot violate the Plaintiffs' right to free speech by continuing to use the Policy Requirement language without an exemption. (Id.)

-11-

The purpose of the preliminary injunction was to bar the Government from chilling protected speech. The Policy Requirement chills speech where it prevents a domestic NGO or its affiliates from obtaining grants under the Leadership Act because it would not adhere to the Policy Requirement. See Alliance, 133 S.Ct. at 2328 ("[W]e have held that the Government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech even if he has no entitlement to that benefit.'") (internal citations omitted). It goes without saying that an organization that does not bother applying for a Leadership Act grant based on the expectation that the Government will deny the grant for failure to meet the Policy Requirement -- where the expectation rose out of the Government's own communications -- has had its speech chilled. If the record indicates that speech was chilled in this manner, then the preliminary injunction has been violated.

The record indicates domestic NGOs were unsure whether to respond to these Other Communications because the communications led them to believe the Policy Requirement would bar them from obtaining grants under the Leadership Act. By letter dated May 4, 2010, Plaintiffs explained to the Government that "a recently issued solicitation for contract awards from [the CDC] includes the full unmodified [Policy Requirement]. [I]t appears that the

-12-

agency is demanding that all organizations -- including those protected by the injunction -- certify compliance with the blanket clause in order to bid for funding." (Dkt. No. 112, Ex. B.) By letter dated July 14, 2010, Plaintiffs wrote, "In the face of [the Court's injunction,] the solicitations at issue nonetheless persisted in requiring all applicants for CDC funds -- including [Plaintiffs] -- to adopt policies opposing prostitution as a precondition of eligibility for funds." (Id.) At the October 16, 2014 conference in this matter, counsel for Plaintiffs stated "I can't tell you how many [of] [t]he 70 organizations we represent just decided not to apply for funding because the policy requirement was in place ... What I can tell you is every time [Other Communications are] issued, I get an email from my clients saying ... What does this mean? Do we have to comply with it?" (Dkt. No. 110, at 14.)

The Plaintiff organizations, understandably, believe the solicitations when the solicitations unqualifiedly state an applicant must "certify compliance with [the Policy Requirement], prior to award, in a written statement." (Id.) Including the Policy Requirement in Government solicitations without any reference to the Plaintiffs' exemption easily could deter grant applications.

On the other side of the calculation, is the minimal burden

-13-

to the Government of having to add the exemption language into its Other Communications. The potential for chilling speech far outweighs a minor inconvenience to the Government. Therefore the Court finds that the Government should include the exemption in its Other Communications.

## E. WHETHER THE POLICY REQUIREMENT CAN STILL BE ENFORCED AGAINST NON-PLAINTIFFS

Plaintiffs also contend that the Supreme Court ruled the Policy Requirement statute itself was an unconstitutional violation of the right to free speech, not as applied but on its face. See Alliance, 133 S. Ct. at 2332 ("The Policy Requirement compels as a condition of federal funding the affirmation of a belief that by its nature cannot be confined within the scope of the Government program. In so doing, it violates the First Amendment and cannot be sustained.") Based on the Supreme Court's decision, this Court foresees no constitutional application of the Policy Requirement as to domestic NGOs or their affiliates. For the same reasons that the Policy Requirement cannot be applied to the Plaintiffs without violating their constitutional rights, applying it to other domestic NGOs or their affiliates would likewise violate their constitutional rights.

If the Government intends to apply the Policy Requirement

to any organizations whatsoever, then the Government must show
cause identifying which categories of organizations and why
imposing the requirement would not violate the decisions of this
Court and the Supreme Court.

F. <u>CONVERTING THE PRELIMINARY INJUNCTION TO A PERMANENT
INJUNCTION</u>

A permanent injunction requires a showing of "(1)
irreparable harm and (2) actual success on the merits." <u>See</u>
<u>Ognibene v. Parkes</u>, 671 F.3d 174, 182 (2d Cir. 2011). This Court
has previously found irreparable harm in this case. (<u>See</u> Dkt.
Nos. 49, 53, 83.) This Court now finds actual success on the
merits, in that enforcing the Policy Requirement against a
domestic NGO or its affiliates violates the First Amendment
rights of the domestic NGO.

### III. <u>ORDER</u>

For the reasons stated above, it is hereby

**ORDERED** that the Government is permanently enjoined from
issuing any official communications -- including but not limited
to RFAs, RFPs, solicitations, and any guidance -- that include
the Policy Requirement without also including a clear exemption
for Plaintiffs and their domestic and foreign affiliates; and it
is further

**ORDERED** that the Government is permanently enjoined from

-15-

applying the Policy Requirement to Plaintiffs or their domestic and foreign affiliates; and it is further

**ORDERED** that the Plaintiffs' request that USAID be ordered to use different language in its grant contracts to exempt Plaintiffs from the Policy Requirement is DENIED; and it is further

**ORDERED** that the Plaintiffs' request that the Defendants be ordered to pay Plaintiffs' fees, costs, and expenses incurred in connection with this matter, is DENIED; and it is further

**ORDERED** that the Plaintiffs' request for an order imposing fines for any further violation of the Court's orders is DENIED; and it is further

**ORDERED** that the Government show cause why this Court should not bar it from enforcing the Policy Requirement against any organization and why allowing the Government to continue to apply the Policy Requirement would not violate the Supreme Court's decision in this matter.

**SO ORDERED.**

Dated:  New York, New York
        30 January 2015

                                    VICTOR MARRERO
                                       U.S.D.J.

-16-